STANLEY WOLFE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ESTATE OF LOUIS WOLFE, Deceased, KATE WOLFE, Spouse-Administratrix, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wolfe v. Commissioner
Docket Nos. 1426-70, 1483-72, 1529-72.
United States Tax Court
T.C. Memo 1974-238; 1974 Tax Ct. Memo LEXIS 82; 33 T.C.M. (CCH) 1049; T.C.M. (RIA) 74238; September 16, 1974, Filed. Ronald F. Kidd, for the petitioners. Brian J. Seery, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in and additions to petitioners' income taxes as follows: Docket Number
Petitioner
Year
Deficiency
Addition to tax Sec. 6653(b), I.R.C. 1954
Addition to tax Sec. 6654, I.R.C. 1954 1426-70
Stanley Wolfe
1963
$ 23,454.30
$ 11,727.15
$ 656.73
1529-72
Stanley Wolfe
1964
44,645.42
22,480.34
3.92
1965
179,812.01
89,906.01
5,027.48
1966
298,029.56
149,169.32
-
1967
345,821.37
180,812.69
-
1483-72
Estate of
1964
38,347.27
19,601.24
-
Louis Wolfe
1965
169,305.01
84,652.51
-
1966
298,199.07
149,099.54
8,338.21
1967
361,205.76
180,602.88
10,101.94
*83 The cases were consolidated for trial. As a result of certain concessions by petitioners, the remaining questions concern whether either Louis Wolfe or Stanley Wolfe or both, during the years here in issue, failed to report income derived from their business activities, and if so, whether any part of the resulting underpayment was due to fraud. FINDINGS OF FACT The parties have filed a stipulation of facts which, together with its accompanying exhibits, is incorporated herein by this reference. Petitioner Stanley Wolfe (to whom the singular use of "petitioner" will refer unless otherwise indicated) filed Federal income tax returns for the years 1963, 1964, 1966 and 1967; each was filed after its respective due date, and no return at all was filed for the year 1965. At the time of filing his petitions herein, Stanley resided in Wyncote, Pennsylvania. Stanley's father Louis, who died in 1968 and whose estate is the other petitioner in these proceedings, filed Federal income tax returns for the years 1964 and 1965; both of these returns were filed late, and there is no evidence that returns were filed in his behalf for either 1966 or 1967. Louis' wife, Kate, representing *84 herself to be the administratrix of his estate, filed the petition herein in its behalf at which time she resided in Philadelphia, Pennsylvania. Louis Wolfe was born in Poland at the turn of this century, and as a young man he emigrated to the United States. At that time he was a tailor by profession, and was entirely without formal education. Although he could possibly read and write to a very limited extent, he was functionally illiterate, and remained such throughout the remainder of his life. Nevertheless, after working as a tailor for an unspecified period, he became a manager of a dress factory, and by 1926 he had begun his own business in New Jersey as a "dress contractor". That business consisted of employing his own hired workers to make garments for particular manufacturers who supplied all the materials that were used in the production of the garments. The business continued until 1952 at which time the Internal Revenue Service became aware that Louis had failed to pay over withholding taxes (income as well as social security) to the Government. He had about 500 employees at that time. As a result of the Government's tax claims, Louis curtailed his former business *85 operations and, with his three sons (Stanley, Nathan and Ronald), proceeded over the next five years to conduct a series of like businesses each operated under an assumed name, including that of his oldest son (Stanley), intended to shield his participation therein from the Internal Revenue Service. However, it soon came to the Government's attention that these various businesses also were not paying the taxes withheld from their employee's wages, on account of which both Louis and Stanley Wolfe were convicted in 1958 of attempting to evade and defeat the payment of Federal taxes, and for which Stanley was placed on probation for five years and fined $1,000 and for which Louis was sentenced to five months in jail and fined $2,500. Nathan Wolfe, a younger brother of Stanley, was indicted together with Louis and Stanley, but the charges against him were later dropped. Upon the completion of his prison sentence, Louis once again opened a dress contracting business and once again conducted the business under several fictitious names. A person named Davidow who had an interest in the business during the years 1958-1962 saw to it that withholding taxes were paid during this period, *86 though not always on time. However, during the years 1958-1962, the Internal Revenue Service continued its attempts to satisfy its pre-1958 claim against Louis. Stanley, too, was subject to the Government's collection activity, which included garnishing his wages from the several jobs he held in New York between 1960 and 1962 as well as seizing his automobile. Toward the latter part of 1962, Louis discontinued his manufacturing activities (which had been carried on in New Jersey), and turned his business efforts to wholesale merchandising, which entailed the purchase of completed, surplus garments from factories and selling them to retail businesses. Both Stanley and Nathan joined their father in this business, which was carried on in the Philadelphia area and the facilities of which consisted of only a single warehouse in Philadelphia. No other persons participated in or were ordinarily employed in this business. Before long, however, the Internal Revenue Service learned of the Wolfes' new enterprise and thereupon seized its entire stock which it later sold at an auction. Despite this financial setback, Louis Wolfe continued to operate a wholesale garment business under a *87 variety of fictitious names throughout the years 1963 through 1967 with the help of Stanley and to some extent of Nathan. Among the business names used in this manner were "Karen Fasions" and "Pam Fashions", derived from the names of Stanley's two daughters, Karen and Pamela. Notwithstanding the misleading array of names involved, however, there was only a single, unincorporated business.Except for infrequently needed help in packing merchandise, Louis, Stanley, and Nathan performed all of the work, which essentially consisted of purchasing surplus or, at times, damaged lots of garments and reselling them to retail outlet stores. In the case of damaged merchandise, Louis would repair the garments before resale. Upon at least one occasion during the years in question, Stanley bought stolen goods from one of the business' regular suppliers which he resold in the normal course of business. During the interval between purchase and resale, the inventory was stored or warehoused in rented space in Philadelphia, at first in the basement of a house with an area of some 1,000 or 1,500 square feet, and from time to time in other rented places. At one time, in 1966, the rented space covered *88 10,000 square feet. The amount of space rented depended upon the current size of the inventory. The business maintained no accurate records of its transactions and suppliers did not always provide invoices. In addition to selling its merchandise, Stanley handled the business' cash receipts and disbursements as well as most of its administrative work which he orally reviewed with Louis. The nature of the surplus clothing business conducted by the Wolfes was such that suppliers did not extend credit to purchasers; the Wolfes paid for their merchandise almost exclusively in cash. They in turn, however, were normally paid by check. During the course of the five-year period in issue, Stanley admittedly opened at least eight accounts in six separate banks, and signed the signature cards in all of them. He used his own name in only one of them. Six others were in the names of various aliases used by him, namely, "Stuart Wolfe", "Joseph Fisher", "Stanley Fisher", "Saul Wolfe", and "Stanley Harris". The eighth account was in the name of "Pam Fashions", a fictitious business name under which the Wolfes' business was sometimes conducted. The signature card for the Pam Fashions account *89 was signed in the name of "Stanley Harris". On at least several occasions Stanley, either in the name of one of his aliases or in his own name, represented himself as the sole owner of the business.He made deposits in the foregoing accounts during the years 1963-1967 as follows: Name of Bank
Name of Account
Aggregate Amounts Deposited by Year
1963
1964
1965
1966
1967 First Pennsylvania Bank & Tr. Co.
Stuart Wolfe
$17,115.34
$ 4,338.25
$ 34,929.84
$ 26,788.25
Girard Trust Co.
Joseph Fisher
29,450.27
118,493.31
Industrial Valley Bank
Joseph Fisher
383,319.03
13,866.13
Industrial Valley Bank
Stanley Fisher *
575,991.71
$684,847.65
Cheltenham National Bank
Saul Wolfe **
55,875.00
27,000.00
Continental Bank & Trust Co.
Stanley Wolfe
1,721.33
Continental Bank & Trust Co.
Stanley Harris ***
63,299.90
Philadelphia National Bank
Pam Fashions 21,473.67
TOTALS
$46,565.61
$122,831.56
$418,248.87
$672,521.09
$798,342.55
*90 The deposits in the foregoing accounts represented checks that were received for merchandise sold by the business which the Wolfes conducted. Stanley made the necessary withdrawals from the foregoing accounts for both his and his father's personal needs, as well as for the business. In only one instance did the depository bank raise a question with respect to Stanley's authority to make withdrawals. Upon noticing that "Stanley Harris", the name in which Stanley Wolfe had opened an account, had been depositing checks payable to "Pam Fashions" in his personal account, the Continental Bank and Trust Company notified petitioner that it had transferred the balance of the "Stanley Harris" account, $51,869.60, to a suspense account in favor of "Pam Fashions". In response to that notification, Stanley Wolfe signed an affidavit, prepared by his attorney and dated December 1, 1967, in which he swore that the names "Pam Fashions" and "Stanley Harris" were both names which he, Stanley Wolfe, used in his solely owned business. In addition to these bank accounts, on March 1, 1967, Stanley, using the name "Alex Wolfe", and his uncle, Samuel Kravitz, authorized W.E. Hutton and Company to *91 open an account in the name of "S and N Corporation" for trading in securities and commodities and permitting margin transactions and short sales. On August 1, 1967, Stanley alone executed an additional authorization to open a security cash account for "S and N Corporation", on which he signed his real name and that of his uncle. On or about September 22, 1967, Stanley applied for an employer's identification number on behalf of "S and N Corporation", signing the application in his uncle's name as president. However, by mid-1967, Samuel Kravitz was no longer associated with "S and N Corporation", which had been integrated into the Wolfes' business. During these years, Louis, a diabetic with failing eyesight, was not a well man. On account of his diabetes and later-discovered cancer, Louis was repeatedly admitted to the Temple University Hospital for the following periods: Date of Admission
Date of Discharge Oct. 19, 1963
Oct. 30, 1963
Mar. 31, 1964
Apr. 10, 1964
Oct. 24, 1964
Oct. 27, 1964
Jan. 30, 1965
Feb. 8, 1965
Feb. 20, 1965
Mar. 1, 1965
May 30, 1965
June 5, 1965
Sept. 17, 1965
Oct. 20, 1965
Feb. 27, 1966
Mar. 27, 1966
Mar. 31, 1966
Mar. 31, 1966
Sept. 1, 1967
Sept. 7, 1967
*92 Louis was admitted to the hospital for the last time on October 16, 1967, where he remained continuously until February 22, 1968, when he died of cancer. As a consequence of his poor health, Louis was compelled to limit his active participation in the business, especially in 1966 and 1967. While Louis was in the hospital, though, Stanley consulted with him regularly in respect of the business. Louis Wolfe filed Federal income tax returns for the years 1963, 1964, and 1965 in which he reported yearly taxable income of $2,196.04, $4,950, and none, respectively. On the Schedule C ("Profit (or Loss) From Business or Profession") of each return, he identified his business variously as "Revlon Garment", "Wayne Frocks", "Lazar Mills", "Louis Fisher", "Selig Wolfe", "Mill Garment Co." and "Stewart Frocks", none of which names corresponded to the names in which Stanley opened the bank accounts described above. On those schedules Louis reported gross sales, cost of goods sold, and gross profit as follows: 1963
1964
1965 Gross Sales
$100,000
$142,000
$375,000
Cost of Goods Sold 91,000 129,550 362,625
Gross Profit
$ 8,000 *
$12,450
$12,375
*93 Aside from contract labor cost of $10,000 in 1963, the only salary and wage deduction claimed by Louis was $1,725 in 1965. No Federal estate tax return was ever filed for Louis Wolfe; nor was any will or letter of administration of his filed with the Register of Wills of Philadelphia County, the county in which Louis had resided and where he died. On those Federal income tax returns which Stanley filed for the years relevant herein, he reported gross income as follows: Year
Amount Reported 1963
$ 3,690
1964
3,250
1965
no return filed
1966
6,560
1967
40,530
For the years 1963 and 1964, Stanley reported no income from salary or wages. For the year 1966, he reported wages of $4,560 paid by "Karen Fashions" and claimed a credit of $1,030.40 for Federal income taxes withheld. On his 1967 return, Stanley reported wages of $40,530 from "Karen Fashions" and claimed a credit for withholding of $15,873. Forms 941 ("Employer's Quarterly Federal Tax Return") were filed by "Louis Fisher, Karen Fashions" for the following quarters indicating the following total amounts withheld from wages paid: Period
Amount Withheld 1Q
1966
None Filed
2Q
1966
None Filed
3Q
1966
None Filed
4Q
1966
$1,413.44
1Q
1967
530.40
2Q
1967
[1] 647.70
3Q
1967
[1] 647.70
4Q
1967
None Filed
*94 A copy of an unfiled Form 941 for the fourth quarter of 1967, provided by Stanley to the Commissioner's agent on February 24, 1969, showed $53,540 in wages paid by "Karen Fashions", of which Stanley was paid $32,730, and a total of $23,019 of taxes withheld. The return was purportedly signed by Louis Wolfe, who for all but the first two weeks of that quarter was a patient in Temple University Hospital. During that period Stanley drew his "salary" in cash and was unaware of any taxes being withheld. At sometime in December of 1967, while he was a patient in the hospital, Louis Wolfe learned that he was dying of cancer. At that time both Louis and Stanley were aware that the Internal Revenue Service was investigating Stanley in respect of unreported income from the business. For that reason Louis Wolfe signed an affidavit, prepared by Stanley's attorney, which stated in substance that he, Louis, was the sole owner fo the various fictitiously named businesses associated with the Wolfes, *95 that he had authorized the opening of the several bank accounts and had exercised sole authority over the withdrawals, that he had made all of the purchases for the business, and that his family members were merely compensated employees. He had conducted the business in this fashion, it further stated, in order to conceal its assets and thereby to prevent the Government from seizing them in satisfaction of prior tax liens. During 1963 and part of 1964, Stanley (who was divorced or separated from his wife) lived with his parents in their apartment at 7441 Limekiln Pike, Philadelphia. Midway through 1964, Stanley moved into a boarding house located near the Temple University Hospital, and in August of that year he leased a two bedroom apartment for which he paid $150 per month. In July, 1967, he moved again, this time into an apartment on Limekiln Pike costing $224 per month. Neither of the apartments was very far from Stanley's parents' apartment, and he often ate his meals there. Until 1964, Stanley owned a Ford Falcon automobile, and when that was no longer operable due to its deteriorated condition, Louis loan Stanley his new 1964 Cadillac. After driving his father's car *96 for approximately six months, Stanley bought a used Chevrolet and returned the borrowed Cadillac. In applying for the first of the two apartments which he rented, Stanley used the name "Stuart Wolfe" and falsely represented himself to be self-employed in New York City earning $25,000 per year and owning a 1964 Cadillac. On the other rental application, he also used the name "Stuart Wolfe". In 1963 Stanley was convicted in Philadelphia of filing false unemployment claims with the states of New York, New Jersey, and Delaware. Stanley also had applied for and received at least three different social security numbers under different names. Throughout the investigation and trial of these cases, neither Stanley nor his father's estate's representative produced any books, records, cancelled checks, invoices, vouchers, and the like, from which the respective incomes of Stanley and his father or the profits of the business could be determined. In separate notices of deficiency for the year 1963 and the years 1964 through 1967, inclusive, the Commissioner determined Stanley Wolfe's unreported gross income by use of the so-called bank deposits method as follows: 1963
1964
1965
1966
1967 Total Deposits
$46,565.61
$122,831.56
$418,248.87
$672,521.09
$798,342.55
Adjusted Gross Income Reported per Return
-
3,250.00
-
6,560.00
40,530.00
Balance
46,565.61
119,581.56
418,248.87
665,961.09
757,812.55
Estimated Cost of Goods Sold
-
40,943.85
139,416.29
224,173.70
266,114.74
Unreported Income
46,565.61
78,637,71
278,832.58
441,787.39
491,697.81
*97 The Commissioner further determined that, for the year 1967, petitioner received $6,105.00 income from the "S & N corporation * * * in the form of securities purchased by you and your former spouse at W.E. Hutton and Co. and paid for by S & N Corp. * * *." In addition to certain unrelated adjustments to which petitioner has agreed, the Commissioner determined that petitioner was subject to self-employment taxes in each year in question, to which petitioner agrees only in the event the Court decides that there is in fact unreported income in those years. The Commissioner also determined that "all or part of the underpayment of tax required to be shown on the returns * * * is due to fraud", and he asserted the 50 percent addition to tax pursuant to section 6653(b) of the Internal Revenue Code. Furthermore, for the years 1963 through 1965, the Commissioner asserted additions to tax under section 6654, I.R.C. 1954, for underpayment of estimated tax. In respect of Louis Wolfe's taxable years 1964 through 1967, the Commissioner adopted inconsistent positions in attributing to Louis all the items of income included in petitioner's second deficiency notice. By *98 reason of this income, the Commissioner also recomputed Louis' self-employment tax liability. Moreover, the Commissioner asserted additions to tax under sections 6653(b), I.R.C. 1954, as well as section 6654. ULTIMATE FINDINGS OF FACT 1. Stanley Wolfe and his father, Louis Wolfe, jointly owned in equal shares the surplus garment wholesale business, which gave rise to gross sales in the amount of the yearly aggregate bank deposits set forth in the table above. 2. In each year under consideration, the cost of goods sold in the Wolfe's business was equal to 75 percent of its gross sales in that year. 3. At least part of the underpayment of tax required to be shown on the individual returns of Stanley Wolfe and Louis Wolfe for each of the respective years involved was due to fraud. OPINION RAUM, Judge: 1. Ownership of the business. The record before us in these cases discloses a confusing and often distasteful story, one marked by deceit, chicanery and trickery on the part of the taxpayers. At the heart of the matter lies the question as to who owned the business conducted by the Wolfes, and thus to whom the income which it generated is attributable. We have before *99 us the Commissioner's determination of deficiencies against Stanley Wolfe for the years 1963-1967 on the theory that Stanley was the owner; at the same time we also have the Commissioner's inconsistent determination involving the years 1964-1967 against the Estate of Louis Wolfe, Stanley's father, to the effect that Louis was the owner. Such inconsistent position was, of course, entirely proper, pending an authoritative adjudication of ownership. Both Stanley and Louis' estate are represented by the same counsel, and the muddied waters became even murkier as a consequence of counsel's attempt to withdraw the petition in Louis' case. If counsel had been successful in that strategy, judgment would have been entered in full against Louis' estate in that case, with the obvious expectation that the Court would be influenced in Stanley's case to find that Louis rather than Stanley was the owner of the business. However, it appears that Louis' estate is wholly judgment proof, and if the strategy were successful the taxes on any unreported income from the business would be reflected only in an uncollectible judgment against an insolvent estate. At a pre-trial conference we indicated *100 that we would not favor the attempt to dismiss Louis' petition, and, with counsel's consent, we denied his motion to withdraw the petition. The cases of both taxpayers were then consolidated for trial, with the understanding that any unreported income from the business would be attributed to the appropriate taxpayer or taxpayers, without any gap or overlap. During the trial, however, counsel for the petitioners made every effort to attribute ownership to Louis, to the theoretical disadvantage of his client in that case, and thereby to extricate Stanley from potential liability by reason of such ownership. As we view the tangled mass of evidence before us, we are convinced that neither Louis nor Stanley was the sole owner of the business. Both of them occupied commanding and dominant positions in respect thereof. Louis, of course, started the business, and we are persuaded that he continued to exert a strong influence over it during the taxable years despite his weakened physical condition. On the other hand, Stanley assumed a significant role and participated extensively in the management of the enterprise, particularly in handling its funds and the control of its various bank *101 accounts which were carried in the several aliases used by him. Indeed the business itself was at times known as "Pam Fashions" and "Karen Fashions", both designations having been derived from the name of Stanley's daughters. Moreover, on at least several occasions Stanley represented himself under oath as the sole owner of the business. We are satisfied that he was not merely a wage-earning employee of his father, as contended by him, but that he had a proprietary interest in the enterprise. In regard to Louis' death-bed affidavit to the extent that he claimed sole ownership, suffice it to say that the circumstances under which it was executed render it too suspect to be accorded full credibility. It is our best judgment on all the evidence that both Louis and Stanley had proprietary interests in the business and we have so found as a fact. And while we realize, of course, that allocations of this sort are not susceptible of precisely drawn lines, it is our best judgment on the materials before us, and we have so found, that the extent of such interests was 50 percent for each of them, [2] cf. Cohan v. Commissioner, 39 F.2d 540, 544 (C.A. 2), and each of them was *102 therefore accountable for one-half the income of the business. 2. Amount of unreported income. The Commissioner determined that the deposits in the eight bank accounts, as set forth in the schedule in our findings, represented the proceeds of sales of merchandise made by the Wolfes' business, and after subtracting not only the adjusted gross income reported on Stanley's or Louis' returns, as the case might be, but also the estimated cost of goods sold, [3] he determined that the remainder represented unreported income. We hold that the method employed by the Commissioner was sound, although we do not accept the amount of his adjustments for cost of goods sold. *103 The record makes clear the difficulties encountered by the Government in attempting to determine the correct amount of income realized from the Wolfes' business. Efforts to obtain books, records, vouchers, invoices, cancelled checks, etc., were met with a stone wall of resistance. In similar circumstances, the Commissioner has often treated as unreported income bank deposits which are unexplained or not shown to represent anything other than reported income or non-income items. This is a familiar and well established technique. The instant situation presents a slight variation in that the deposits are treated not as gross income per se, but as the proceeds of sale from which the cost of goods must be subtracted in order to arrive at gross income. We are fully satisfied on the evidence that the deposits did in fact reflect the proceeds of sale. [4] Petitioners object, however, to the formula used by the Commissioner in determining the cost of goods sold. The Commissioner determined *104 that the cost of the merchandise was 33-1/3 percent of the sales price, whereas petitioners contend that it was 90 percent of sales price. The evidence was unsatisfactory. We did not believe the testimony in support of petitioners' position nor did we find that the several general exhibits which they presented in evidence in this connection could be applied to the facts of this case without substantial adjustment. On the other hand, we are persuaded by the evidence that the Commissioner's formula (which in substance assumed a 200 percent mark-up of sales price over cost) was unrealistically low. The situation that confronts us is this: in our judgment the cost claimed by petitioners is too high and that allowed by the Commissioner is too low. In the circumstances we must of necessity do the best we can with the materials at hand, meager as they are, and have therefore found as a fact that the cost of goods sold was 75 percent of the sales price as reflected in the deposits. Cf. David J. Pleason, 22 T.C. 361, 371, affirmed 226 F.2d 732, 734 (C.A. 7), certiorari denied, 350 U.S. 1006; Michael Potson, 22 T.C. 912, 928-929, affirmed *105 sub nom. Bodoglau v. Commissioner, 230 F.2d 336, 340-341 (C.A. 7); Cohan v. Commissioner, supra.
3. Fraud. We think that fraud in the cases of both Stanley and Louis has been proved by clear and convincing evidence. Even in view of our above conclusions which have the effect of reducing the unreported taxable income attributable to each of the taxpayers, the amounts involved exceed that which might reasonably, even negligently have been overlooked. Indeed, there emerges from the record a consistent pattern of loose play with the tax laws by both Stanley and Louis which strongly indicates purposeful disregard. Stanley's almost incredible history of lies and misrepresentations simply underscores the difficulty we have in believing his denials in this respect. We are, of course, keenly aware that merely concealing business assets does not necessarily connote an intention to evade taxes, but neither are the two mutually exclusive, and we have concluded that the Commissioner has sustained his burden of proving by clear and convincing evidence that for each of the taxpayers all of or a part of the deficiencies for each of the taxable years is due to fraud *106 with intent to evade tax. In order to reflect the computations necessitated by our conclusions above Decisions will be entered under Rule 155. Footnotes
*. In connection with the opening of this account, there was supplied to the bank a copy of a fictitious name registration for "Karen Fashions", which had been filed in New Jersey. "Stanley Fisher" alone was listed thereon as the owner of the business. "Karen Fashions" was simply another name under which the Wolfes conducted their business. ↩
**. The address given on the signature card was that of Stanley Wolfe. ↩
***. The address given on the signature card was a piece of property rented by Stanley Wolfe, using the name "Joseph Fisher" and his two brothers. ↩
*. Based on the reported gross sales ($100,000) and cost of goods sold ($91,000), this figure should have been $9,000. ↩
1. The parties have stipulated to this figure, which, however, is inconsistent with the amount of $674.70 which actually appears in each of the Forms 941 which accompanied the stipulation. ↩
2. The record shows that Stanley's younger brother Nathan also took part to some extent in the operation of the business, but his role appears to have been a less significant one, and we have not found that his participation was that of an owner as distinguished from that of an employee. It is not contended herein by any of the parties in this litigation that Nathan was an owner. ↩
3. Only in respect of 1963 did he fail to make adjustments for cost of goods sold. This was error, and in the decision to be entered under Rule 155, an appropriate adjustment for cost of goods sold will be made. ↩
4. Of course, if any of the deposits, otherwise unexplained, did not represent proceeds of sale of merchandise, they would be treated as gross income without any reduction for cost of goods sold. ↩